Opinion delivered March 12, 1887.

No. 2291.

WILLIAM ROWLETT *v.* THE STATE.

1. CONCLUSION OF INDICTMENT.—If the pleader concludes the indictment with the phrase "against the peace and dignity of the State," no words following that phrase and not forming part of it can vitiate the indictment. See the opinion in this case in illustration, and note the comment upon Haun's case, 13 Texas Court of Appeals, 383.

2. PPESENTMENT OF INDICTMENT—PRACTICE.—Objection to an indictment is primarily made in this court on the ground that the record shows that the indictment was not presented in open court by the grand jury. The objection is based upon the fact that the clerk of the court below, in noting upon the minutes the presentment of the indictment, misnamed the offense charged in it. *Held* that if the objection could ever have been maintained, it could only have been made available by exception to the indictment in the trial court before the plea of not guilty was entered, and comes too late when first raised in this court. But even upon its merits the objection is futile, inasmuch as there was no occasion to name the offense in the minutes of the trial court, and the clerk's unnecessary and erroneous attempt to do so can not vitiate the indictment.

3. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to sustain a conviction for murder in the second degree.

APPEAL from the District Court of Williamson. Tried below before the Hon. A. S. Walker.

The indictment in this case charged the appellant and Samuel Dunbar jointly with the murder of James Davis, in Williamson

county, Texas, on the fifteenth day of June, 187:. The appellant, being alone upon trial, was found guilty of murder in the second degree, and his punishment was assessed at a term of five years in the penitentiary.

J. J. Sides was the first witness for the State. He testified that he lived in the lower part of Williamson county at the time of Davis's death. The witness, his younger brother, and his brother-in-law, Townsend, were together about four miles south of the Lawrence crossing of Brushy creek, a short time before the killing of Davis. About noon they met the defendant and Dunbar traveling towards the Lawrence crossing. They asked Townsend if he had seen an ox wagon and a four horse wagon traveling down the road. Townsend replied that he had, and they left, going in the direction of the crossing. A very short time after witness reached his home, two miles from the crossing, Charley Eubanks rode up rapidly and reported the killing of a man at the crossing?

Three quarters of an hour had then elapsed since the witness had parted with defendant. Witness, Frank Williams and Townsend immediately saddled their horses and went to the crossing. At the edge of the bottom they saw Dunbar and some children going down towards the creek. Davis was found lying on the ground near the creek, shot through the heart. He was still alive and bleeding freely. He died about fifteen minutes later, without speaking. Dunbar, some children and a girl about grown, were the only parties near Davis when the witness and his party arrived. Witness did not see the defendant again until the summer before this trial, but about five years ago heard that he was on his place on the Yegua. Witness saw nothing of a negro about the body. An ox wagon and a four horse wagon stood near the body. Witness turned Davis from his side to his back, and from his back to his side before death ensused, but neither saw nor felt a weapon of any kind about his person. Other persons came soon after Davis died, and witness left them in charge of the body, and went off to make arrangements for Davis's burial. Dunbar told witness the young lady was the step daughter and the young children the daughters of Davis.

P. A. Sides testified, for the State, that he was with J. J. Sides on the prairie on the morning of the fatal day, and with him and Townsend when they met the defendant and Dunbar. Defendant asked Townsend if he had seen two wagons, which he

described. Townsend replied that he had seen such wagons going towards the Lawrence crossing.

C. H. Eubanks testified, for the State, that when the fatal shot was fired he was on the high bank of Brushy creek, a short distance above the Lawrence crossing, lying under his wagon. He heard a wagon drive down to the creek on the opposite side, and in a few minutes he heard a shot fired, followed by the screaming of children. Witness ran to a point commanding a view of the crossing, and saw a wagon standing near the creek, a man on horseback standing rather behind the wagon, and another man at the creek dipping up water. That man took the water immediately to the man on horseback, who drank it and rode off in a south direction. Witness then went to the wagon and found a man lying on the ground, about five feet west of the end of the wagon tongue. He was shot through the heart. Witness remained at the wagon but a short time and left to get help. He was gone about an hour, and found Davis still alive when he returned. Witness saw an old meat knife, with a five inch blade, lying on the ground; but could not remember whether he first saw it when he first reached the wagon or after his return from his quest for help. Witness had not seen the defendant in Williamson county since the killing until this trial, but had been told that he secretly visited the county about five years ago.

Mrs. N. M. Newberry testified, for the State, that the defendant was her uncle, being her mother's brother. The deceased was her step father, being her mother's second husband. Dunbar was her cousin on her mother's side. Davis's children by witness's mother were four in number, the oldest about thirteen and the youngest about one year old at the time of the killing. Davis, with his family and the witness, then sixteen years old, left Bastrop county to move to Bell county, on the day before the killing. They traveled in a four horse wagon driven by Davis, and an ox wagon driven by a negro. They stopped to noon on the fatal day at the Lawrence crossing of Brushy, in Williamson county. They were overtaken by defendant and Dunbar just before they stopped. The greeting between defendant, Dunbar and Davis was apparently pleasant. When the wagons were stopped, Davis and his son took out the lead horses and led them to water. When they came back Davis commenced to ungear the off wheel horse, and he and defendant began to talk. Defendant asked Davis: "Why didn't you bring

13 — TEX. APP. XXIII.

the children by to see us and tell us good bye?" Davis asked: "Is that what you have followed me for?" Defendant replied that it was, and he and Davis started towards each other. Defendant told Davis three times to stop. Davis continued to advance, and defendant shot him. Davis was not armed, and made no motion towards defendant.

Cross examined, the witness said that her mother had been dead something more than a year at the time of the killing. On the day before witness started with Davis to Bell county, she sent word by a Mrs. Perkins to her grand mother Rowlett, the defendant's mother, that she would stop to see her as they passed on their way to Bell county. She could not say that Mrs. Perkins delivered that message. Witness was going to Bell county with Davis on his promise to take her back to Bastrop county in twenty days. While Davis was at the creek with his horses, just before the killing, the defendant asked witness if she was going off with Davis of her own accord. Witness told him that she was, as Davis had promised to take her back in twenty days. He then asked if witness placed any confidence in that promise, and witness replied that she did. Defendant replied: "Then it is all right." About that time Davis returned to the wagon, and the shooting occurred in the manner related by witness. Davis generally carried a knife in his belt. Witness did not know where the knife was at the time of the killing. She saw nor heard nothing of it at that time.

Sam Dunbar was the next witness for the State. He testified that he was the party jointly charged with defendant in this indictment. His narrative of the occurrence from the time that he and defendant overtook Davis and his family was an almost circumstantial repetition of the narrative of Mrs. Newberry. In addition he stated that after he and defendant started in pursuit of Davis, they stopped at one Cook's, where defendant borrowed the pistol with which he killed Davis. Defendant fired off the three loads in the pistol, went into the house, and moulded some fresh bullets, with which he loaded the pistol all around. He put the pistol and a knife in his belt, and pursued Davis, with the results narrated. Witness saw no weapon in Davis's hands at the time of the killing, but he knew that Davis was advancing and defendant retreating, and that defendant had warned Davis off three times when he fired the fatal shot. Witness next saw the defendant four or five weeks after the killing, when he came secretly to witness's house. He had then employed

C. C. McGinnis, a lawyer of Bastrop, and was in hiding, until he could arrange to make a bail bond. He subsequently left the country, but returned four or five years ago, and traveled about openly, buying cattle.

Cross examined, the witness testified that since the death of her mother, Miss Mattie Bains (Mrs. Newberry) had lived with her step-father, the deceased. On the evening before Davis started to Bell county, Mrs. Rowlett, Miss Bains's grandmother, received a message from Miss Bains that she did not want to go to Bell county with Davis, but wanted to make her home with her grand parents; that she would go with Davis as far as her uncle William's (defendant's) house, and requesting Mrs. Rowlett to send there for her. At the request of Mrs. Rowlett, witness went to the defendant's house on the morning of the killing, which was the morning after Davis left, to escort Miss Bains to old man Rowlett's. Not finding Miss Bains at defendant's, witness reported to defendant the purport of her message to her grand mother. Defendant then proposed that he and witness should follow Davis and ascertain whether or not Miss Bains was going off willingly, and, if so, to submit. At Cook's house inquiries were made about Davis and his family. Cook said that he traveled some distance with them, but could give no information as to whether Miss Bains was going willingly or under compulsion. Cook then asked defendant if he had any arms. Defendant replied that he had none and would need none; that he and Davis would not quarrel. Cook replied that he thought it was unsafe to go unarmed, as he believed the Fowler boys were keeping along in sight of the wagons and would make trouble. Thereupon the defendant accepted Cook's offer of the pistol. Defendant said at Cook's, and often along the road, that he wanted no trouble with Davis, and that all he wanted was to get Miss Bains quietly if she was being taken off and wanted to return. He said in the same connection that if she was going willingly, he would not interfere further. The best manner of ascertaining from Miss Bains whether or not she was going willingly was discussed along the route, as was the means of taking her back if she wanted to go. Defendant finally said that if Miss Bains wanted to go back, he would put her behind witness on his horse, and witness was to ride off; that about all Davis would do would be to curse, and that he would stand his ground and curse back until witness and Miss Bains got off a safe distance, when he would ride off, leaving Davis to take it

out in cursing. It was decided to get a private interview with
Miss Bains, and, if she announced her willingness to go with
Davis, to do nothing more than ask Davis why he did not go by
defendant's house to bid them farewell. Such excuse for follow-
ing was devised as the one least likely to hurt Davis's feelings.
Davis was a very active and brave man, and when aroused was
a very dangerous adversary. His manner, tone and face showed
great anger when he advanced upon defendant. He continued
to advance, although thrice warned off by defendant. His left
hand, having nothing in it, was extended when the fatal shot
was fired. Witness could not then see his right hand. After
Davis's death witness saw a large butcher knife, such an one as
he had often seen Davis have, lying on the ground, some six or
eight feet from where the body lay. He believed that knife to
be the one owned by Davis.

No testimony was introduced by the defendant.

The motion for new trial raised the questions discussed in the
opinion.

*G. W. Jones* and *Fisher & Townes*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. It is objected to the indictment that it does
not conclude "against the peace and dignity of the State," and
is, therefore, a nullity. The original indictment is before us,
and we find that the words "against the peace and dignity of
the State" followed immediately after the charging portion of
the indictment, and are the last words used by the pleader. In
the next line below these words, and without any grammatical
or other connection therewith, in a different handwriting from
that of the indictment, are the words, "A true bill," followed
immediately and in the same handwriting by the official signa-
ture of the foreman of the grand jury. We hold that these in-
terpolated words, "a true bill," do not vitiate the indictment.
They are no part of the indictment; are outside of and wholly
disconnected with it. They are no part of the conclusion of said
indictment, and in this respect the case differs materially from
that of Haun v. The State, 13 Texas Court of Appeals, 383, as
will be seen by reference to that decision. The language of that
decision may be, and we think is, too broad and unqualified, but
the conclusion arrived at with respect to that particular indict-

ment was, we still hold, correct, for the reason that the words following the conclusion proper were connected with said conclusion in the same sentence, and manifestly formed a portion of said sentence; and therefore the indictment upon its face did not conclude as required by the statute and the Constitution. We are of the opinion that where the indictment upon its face shows the pleader's conclusion to be "against the peace and dignity of the State," these words forming a complete sentence, no words following thereafter and not forming a part of said sentence can vitiate the indictment.

Another objection to the indictment is for the first time presented in this court. It is that it affirmatively appears from the record that said indictment was not presented in open court by the grand jury. The record shows the file number of the cause in the District Court to be seven hundred and six, the charge in the indictment being *murder.* The entry upon the minutes of said court of the presentment by the grand jury of indictment number seven hundred and six names the charge in said indictment "an assault with intent to kill." Upon its face the indictment shows that it was presented in the District Court by a legal grand jury. This recital in the indictment must be presumed to be true until it is shown to be otherwise. It devolves, therefore, upon the defendant to show that the indictment was not in fact presented in court. How and when does the law permit him to make such objection? We answer by exception to the indictment, which exception must be made before a plea of not guilty is entered. It can not be entertained when made for the first time in this court. (Hardy v. The State, 1 Texas Ct. App., 556, Alderson v. The State, 2 Texas Ct. App., 10; Strong v. The State, 18 Texas Ct. App., 19; DeOlles v. The State, 20 Texas Ct. App., 145.)

But, even if the objection now for the first time urged had been made *in limine* in the trial court, at the proper time and in the proper manner, we do not think it would have been a valid objection to the indictment. It is only required that the style of the action and the file number of the indictment shall be entered upon the minutes. (Code Crim. Proc., art. 415.) In this instance this requirement was fulfilled. It was not essential that such entry should name the offense charged in the indictment. (Steele v. The State, 19 Texas Ct. App., 425.) Not being essential to the sufficiency of the entry to name the offense charged, it was an unnecessary act on the part of the clerk to do

so, and should not be held to vitiate the indictment, although the offense named in said entry is not the offense charged in the indictment.

It is earnestly contended by counsel for defendant that the evidence is insufficient to sustain the conviction, in this, that the evidence in support of the plea of self defense is at least cogent enough to raise a reasonable doubt of the guilt of the defendant. In this view of the evidence we do not agree with counsel. We do not think the facts showed, or even strongly tend to show, that character of self defense which would either justify or reduce the homicide to manslaughter. If the deceased, at the time he was shot, had been advancing upon the defendant in an angry manner, armed with a butcher knife, then indeed would defendant's theory of self defense be established. But, unfortunately for the defendant, the evidence does not disclose such a state of the case. On the contrary all of the eyewitnesses to the transaction testified on the trial that the deceased was unarmed at the time he was shot by the defendant. They were in positions where they could and did see the deceased at the time, and they saw no knife or other weapon on or about his person.

The only evidence which even remotely tends to prove that the deceased was armed with a butcher knife is that such a knife was found upon the ground where the homicide occurred a short time after the difficulty, and that this knife belonged to the deceased. How, when or by whom the knife was placed upon the ground is not disclosed. Deceased was at the time of the occurrence traveling in a wagon with his family consisting of several small children, and had stopped to camp for dinner. These children were around the wagon, and may have had and dropped the knife where it was found. Deceased may himself have dropped it before the difficulty occurred. After defendant had shot deceased, witness Dunbar said to defendant "you have killed Davis." Defendant replied, " Yes, he ought to have kept off of me." Nothing was said by defendant at the time about deceased having a knife. If in fact deceased had been advancing upon the defendant with a butcher knife in his hand, and defendant had seen that he was thus armed, it is passing strange that he did not mention the fact to Dunbar at the time of said conversation, and call the attention of that witness to the knife. Instead of doing so, however, he mounted his horse and fled the country, and avoided trial for a number of years.

As to the charge of the court, it is full and correct, and fair and liberal to the defendant, presenting clearly the law applicable to every phase of the case made by the evidence.

We are of the opinion that there is no error in the conviction, and the judgment is affirmed.

*Affirmed.*